# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| NELSON EVANS, JR.<br><br>    Plaintiff,<br><br>vs.<br><br>WRIGHT MEDICAL TECHNOLOGY, INC.,<br>    Defendant. | No. C19-55-LTS<br><br>**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S PARTIAL MOTION TO DISMISS** |

## I. INTRODUCTION

This medical products liability case is before me on a partial motion (Doc. No. 21) to dismiss by defendant Wright Medical Technology, Inc. (WMT). WMT seeks to dismiss Counts 4 and 5 of the first amended complaint, along with plaintiff's claim for punitive damages. Plaintiff Nelson Evans, Jr., has filed a resistance (Doc. No. 31). I find that oral argument is not necessary. *See* Local Rule 7(c).

## II. BACKGROUND

Evans filed his complaint on May 4, 2019, and a first amended complaint (Doc. No. 13) on August 23, 2019. He alleges that on November 29, 2004, he received a hip replacement using WMT's Total Hip System and had to undergo a revision surgery on May 4, 2017, to replace the faulty system. Doc. No. 13 at 2-3. He asserts claims of failure to warn, negligence, negligent misrepresentation, breach of express warranty, breach of implied warranty of fitness for a particular purpose and implied warranty for merchantability. He requests various forms of relief, including compensatory damages and punitive damages.

WMT argues that Count 4 (Negligent Misrepresentation) fails on a legal basis and that Count 5 (Breach of Express Warranty) is barred by the statute of limitations. Thus,

the specific factual allegations related to those counts are not particularly relevant. WMT does argue, however, that Evans' allegations are insufficient to state a claim for punitive damages. The specific allegations related to Evans' punitive damages claim will be discussed in greater detail in that section.

### III. APPLICABLE STANDARDS

The Federal Rules of Civil Procedure authorize a pre-answer motion to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Supreme Court has provided the following guidance in considering whether a pleading properly states a claim:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007)], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555, 127 S. Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955.
>
> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S. Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S. Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* at 557, 127 S. Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009).

Courts assess "plausibility" by "'draw[ing] on [their own] judicial experience and common sense.'" *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 679). Also, courts "'review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation.'" *Id.* (quoting *Zoltek Corp. v. Structural Polymer Grp.*, 592 F.3d 893, 896 n.4 (8th Cir. 2010)). While *factual* "plausibility" is typically the focus of a Rule 12(b)(6) motion to dismiss, federal courts may dismiss a claim that lacks a cognizable *legal* theory. *See, e.g.*, *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013); *Ball v. Famiglio*, 726 F.3d 448, 469 (3d Cir. 2013); *Commonwealth Prop. Advocates, L.L.C. v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1202 (10th Cir. 2011); *accord Target Training Intern., Ltd. v. Lee*, 1 F. Supp. 3d 927 (N.D. Iowa 2014).

In considering a Rule 12(b)(6) motion to dismiss, ordinarily the court "cannot consider matters outside the pleadings without converting the motion into a motion for summary judgment." *McMahon v. Transamerica Life Ins.*, No. C17-149-LTS, 2018 WL 3381406, at *2 n.2 (N.D. Iowa July 11, 2018); *see* Fed. R. Civ. P. 12(b)(6). On the other hand, when a copy of a "written instrument" is attached to a pleading, it is considered "a part of the pleading for all purposes," pursuant to Federal Rule of Civil Procedure 10(c). Thus, when the pleadings necessarily embrace certain documents, I may consider those documents without turning a motion to dismiss into a motion for summary judgment. *Id.* These documents include "exhibits attached to the complaint." *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

When a complaint does not state a claim for relief that is plausible on its face, the court must consider whether it is appropriate to grant the pleader an opportunity to replead. The rules of procedure permit a party to respond to a motion to dismiss by amending the challenged pleading "as a matter of course" within 21 days. *See* Fed. R. Civ. P. 15(a)(1)(B). Thus, when a motion to dismiss highlights deficiencies in a pleading that can be cured by amendment, the pleader has an automatic opportunity to

do so. When the pleader fails to take advantage of this opportunity, the question of whether to permit an amendment depends on considerations that include:

> whether the pleader chose to stand on its original pleadings in the face of a motion to dismiss that identified the very deficiency upon which the court dismissed the complaint; reluctance to allow a pleader to change legal theories after a prior dismissal; whether the post-dismissal amendment suffers from the same legal or other deficiencies as the dismissed pleading; and whether the post-dismissal amendment is otherwise futile.

*Meighan v. TransGuard Ins. Co. of Am.,* 978 F. Supp. 2d 974, 982 (N.D. Iowa 2013).

## IV. ANALYSIS

### A. Count 4 – Negligent Misrepresentation

WMT argues this claim fails because there are no allegations that WMT is in the business of supplying information to others – a necessary element under Iowa law.[1] *See* Doc. No. 21-1 at 5. Evans alleges that WMT "was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, numerous prosthetic orthopedic products, including the Wright Total Hip System." Doc. No. 13 at 4.

Evans argues the Iowa Supreme Court expanded its view of negligent misrepresentation in *Dinsdale Const., LLC v. Lumber Specialties, Ltd.*, 888 N.W.2d 644, 651 (Iowa 2016). He contends the Court established that negligent misrepresentation can be applied "beyond persons in the course of their business or profession of supplying information" to others who have "a pecuniary interest in supplying the information." Doc. No. 31 at 6 (citing *Dinsdale Constr., LLC*, 888 N.W.2d at 651). Evans argues that WMT meets with physicians and provides false information about its devices in pursuit

---

[1] Both parties address Counts 4 and 5 under Iowa law. *See* Doc. Nos. 21-1, 31. Because Evans alleges that he is an Iowa resident and that WMT's Total Hip System was implanted in Iowa, I will likewise look to Iowa law in considering these claims.

4

of its pecuniary interest. He further alleges that WMT publishes guides on its website and product brochures containing inaccurate and misleading information about the safety and efficacy of its products and also makes misrepresentations in its marketing, advertisements, promotions and labeling. *Id.* at 7.

"[T]he tort of negligent misrepresentation does not apply to sellers of products but rather is limited to those in the business or profession of supplying information for the guidance of others." *Huck v. Wyeth, Inc.*, 850 N.W.2d 353, 371 (Iowa 2014). Those in the business of supplying information include professionals such as accountants, appraisers, school guidance counselors and investment brokers." *Id.* (citing *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 111-12 (Iowa 2012). The Court in *Dinsdale* explained:

> In our effort to distinguish those circumstances when a person has a duty to use reasonable care in supplying information from those circumstances when there is no duty, we have articulated various considerations derived from the framework of the Restatement rule. We seek to distinguish advisory relationships from relationships that are adversarial and at arm's length. *See Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 111 (Iowa 2012). We seek to distinguish the sale of information as a product from information given incidentally as part of another transaction. *Id.* at 112. We distinguish professional purveyors of information from those who work in another capacity. *Id.* Finally, we seek to capture the concept of foreseeability within those circumstances that impose a duty of care. *Id.* at 111-12.
>
> These considerations are principles of law that help frame the parameters of the tort and express its rationale more than they are factors to weigh in determining the existence of a duty. In each instance, we must only impose a duty on persons who, "in the course of [their] business, profession or employment, or in any other transaction in which [they have] a pecuniary interest," supply information to others in their business transactions. Restatement § 552(1), at 126. The distinctions we have observed exist to help in the application of this rule and are often aligned with the presence or absence of a pecuniary interest in giving the information.

*Dinsdale Constr., LLC*, 888 N.W.2d at 650-51. The Court concluded that the defendant in *Dinsdale* was in the business of providing a variety of products and services, including information. *Id.* at 651. It provided both tangible construction materials and intangible engineering services. *Id.* Because it operated a "mixed" business, the Court looked to the specific transaction that gave rise to the claim of liability. *Id.* at 651-52. It noted that defendant did not contract with plaintiff to provide engineering services pertaining to the work. It did, however, through its employee, supply plaintiff with information or advice concerning the integrity of the work. *Id.* at 653. The Court noted this was done outside the scope of the contract and the duty question turned on whether the defendant had a pecuniary interest in the informational transaction. The Court found that the evidence showed the employee supplied the information as a courtesy to a customer in furtherance of the overall business interests of defendant. *Id.* The Court concluded as follows: "The tort of negligent misrepresentation is not broad enough for the pecuniary interest in a transaction to come from general goodwill potentially derived by a business in supplying requested advice or information to a customer as a courtesy following the sale of a product." *Id.* at 654. The Court made clear that negligent misrepresentation requires that the defendant have a pecuniary interest in supplying the information itself. *Id.* at 652-55.

Here, there are no allegations that any part of WMT's business is supplying information. Evans does not allege that WMT makes money by providing information, advice or counsel. Rather, it makes money by selling products. Supplying information by way of advertisements and marketing for those products does not give it a pecuniary interest in supplying the information itself – the key factor. To the extent *Dinsdale* expanded the tort of negligent misrepresentation, the transaction at issue here between WMT and Evans does not fall within its reach. WMT is not alleged to have supplied Evans with information for any type of direct or indirect consideration. Rather, the transaction represents an arm's length commercial transaction that does not give rise to the applicable duty in a negligent misrepresentation claim. *See Fry v. Mount*, 554

N.W.2d 263, 265-66 (Iowa 1996) ("Where the defendant is not in the business of supplying information, and the parties deal at arm's length in a commercial transaction, our courts have refused to recognize a duty arising under [the Restatement (Second) of Torts] section 552."); *Pitts*, 818 N.W.2d at 111 (distinguishing between relationships that are arm's-length and adversarial and those that are advisory); *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 227 (Iowa 1998) ("[I]f the transaction at issue took place at arm's length, the plaintiff's cause of action must fail."). Because Evans' claim of negligent misrepresentation against WMT is not recognized under Iowa law, WMT's motion to dismiss Count 4 will be granted.

### B. Count 5 – Breach of Express Warranty

WMT argues this claim is untimely under Iowa's statute of limitations. *See* Iowa Code § 614.1 (providing that claims for breach of warranties in unwritten contracts are subject to a five-year statute of limitations). WMT argues a cause of action for breach of express warranty "accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Doc. No. 21-1 at 11 (quoting Iowa Code § 554.2725). It relies on *Sparks v. Wright Medical Technology Inc.*, No. 12-CV-84, 2013 WL 1729211, at *2-4 (N.D. Iowa Apr. 22, 2013) in which this court dismissed all warranty claims as untimely because the statute began to run when plaintiff received his right hip implant nearly five years beyond the five-year statute of limitations. *Id*. Here, Evans received his implant on November 29, 2004, and did not file this action until May 4, 2019. *Id*. at 12.

Evans argues WMT's argument is based on an unwritten warranty but that his claim involves a written warranty. *See* Doc. No. 31 at 7-8. He notes that under Iowa Code § 554.2725(2), "where a warranty explicitly extends to future performance of the goods" "the cause of action accrues when the breach is or should have been discovered." *Id*. Evans alleges that the written warranty is provided in information on WMT's website and its product brochures in addition to marketing in journal ads and newspaper articles

warranting the safety and performance of the product. He does not, however, provide the specific language of the alleged written warranty. Evans alleges that because he brought this lawsuit within two years from the date he discovered the cause of his injuries, his breach of express warranty claim is timely.

Under Iowa law, the statute of limitations for a claim based on an unwritten contract is five years. Iowa Code § 614.1(4). Section 554.2725(2) addresses the statute of limitations in contracts for sale and provides:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Iowa Code § 554.2725(2). The Iowa Supreme Court has held:

> the discovery rule is applicable to cases arising from express and implied warranties. This holding, of course, does not apply to situations in which statutes expressly provide that a cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. *See e.g.*, § 554.2725.

*Brown v. Ellison*, 304 N.W.2d 197, 201 (Iowa 1981), *overruled on other grounds by Franzen v. Deere & Co.*, 334 N.W.2d 730 (Iowa 1983). Thus, unless the warranty "explicitly extends to future performance of the goods," Evans' breach of express warranty claim is time-barred.

The requirement that a warranty explicitly extends to future performance is "vigorously enforced." *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 879 (8th Cir. 2000). "The terms of the warranty must unambiguously and explicitly indicate that the manufacturer is warranting the future performance of the goods for a *specified period of time*." *Sudenga Indus., Inc. v. Fulton Performance Prods., Inc.*, 894 F. Supp. 1235, 1238-39 (N.D. Iowa 1995) (emphasis in original). *See also Economy Housing Co., Inc. v. Continental Forest Prods., Inc.*, 805 F.2d 319, 321 (8th Cir. 1986)

("The overwhelming weight of authority requires a buyer . . . to prove that its seller specifically warranted the product for a defined period of time in the future."); *John Q. Hammons Hotels, Inc. v. Acorn Window Systems, Inc.*, No. C01-0151, 2003 WL 22852124, at *6 (N.D. Iowa Oct. 15, 2003) ("The terms of the warranty must unambiguously and explicitly indicate that the manufacturer is warranting the future performance of the goods for a specified period of time."). Any ambiguity is interpreted against the existence of such a warranty. *Sudenga Indus., Inc.*, 894 F. Supp. at 1238-39.

Evans has not made any allegations of an explicit warranty for a specified period of time in the future. *See* Doc. No. 13. He alleges generally that WMT "expressly warranted that the Wright Total Hip System devices were safe and effective orthopedic devices for those patients requiring a hip replacement." *Id.* at 28. This is insufficient to meet the requirement of a warranty that explicitly extends to future performance. *See Marvin Lumber and Cedar Co. v. PPG Indus. Inc.*, 223 F.3d 873, 879 (8th Cir. 2000) ("an express warranty of the present condition of goods without a specific reference to the future is not an explicit warranty of future performance, even if the description implies that the goods will perform a certain way in the future."). Therefore, the cause of action accrued when the breach occurred (when tender of delivery was made). *See* Iowa Code § 554.2725(2); *John Q. Hammons Hotels, Inc.*, 2003 WL 22852124, at *6 ("The ordinary rule is that the statute of limitations in a breach of warranty action begins to run once the seller tenders the goods."). As noted above, Evans alleges that the Wright Total Hip System was implanted on November 29, 2004. Doc. No. 13 at 17. Therefore, the statute of limitations began running on that date.

Regarding whether any express warranty was written or unwritten, Evans has provided only an advertisement. *See* Doc. No. 13 at 13. This is not a written warranty. *See* Iowa Code § 554.2313 ("It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that the seller have a specific intention to make a warranty, but an affirmation merely of the value of the goods

or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."). Evans has not alleged the existence of any other written warranty. As such, the five-year statute of limitations for an unwritten contract applies to this claim. *See* Iowa Code § 614.1(4). Because Evans did not file suit until May 4, 2019, his breach of express warranty claim is time-barred and WMT's motion to dismiss Count 5 will be granted.

### C. *Punitive Damages*

WMT argues that punitive damages are governed by Tennessee law and that, under Tennessee law, Evans has failed to allege the conduct required to support an award of punitive damages. WMT compares the allegations in this case to those in a previous case in which I dismissed that plaintiff's claim for punitive damages. *See Dumler v. Wright Med. Tech., Inc.*, No. C17-2033, 2018 WL 576848, at *15 (N.D. Iowa Jan. 26, 2018). Evans notes that in *Dumler*, I concluded that a choice of law analysis was not required as the standards under Tennessee and Iowa law were similar and the outcome would be the same under either state's laws. His resistance is based on Iowa law.

Under Iowa law, punitive damages may be awarded if a plaintiff proves by a "preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1. "Willful and wanton" conduct means:

> the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which is usually accompanied by a conscious indifference to the consequences.

*Mercer v. Pittway Corp.*, 616 N.W.2d 602, 617 (Iowa 2000) (quoting *Fell v. Kewanee Farm Equip. Co.*, 457 N.W.2d 911, 919 (Iowa 1990)). Defendant's conduct must constitute actual or legal malice. *Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 396 (Iowa 2001). "Actual malice is characterized by such factors as personal spite, hatred,

or ill will." *Id.* (quoting *McClure v. Walgreen Co.*, 613 N.W.2d 225, 231 (Iowa 2000)). "Legal malice is shown by wrongful conduct committed for continued with a willful or reckless disregard for another's rights." *Id.*[2]

Evans cites the following paragraphs in his first amended complaint that he alleges, if true, would meet this standard:

- Despite its unorthodox design, Defendants did not properly test the CONSERVE® Hip System for safety, efficacy and durability. Other metal-on-metal (hereinafter "MOM") prosthetic hip device manufacturers carefully screen, select and train orthopedic surgeons on proper implant procedures for their respective devices. However, Defendants aggressively marketed, promoted and encouraged orthopedic surgeons in the U.S. to use the CONSERVE® System without screening, selecting, or training the surgeons on how to implant the CONSERVE® System. Doc. No. 13 ¶ 22.

- While Defendant WRIGHT wanted to market its Wright Total Hip System in the U.S., it did not want to endure the long and expensive FDA approval process. Instead, WRIGHT exploited a loophole in FDA regulations that would allow its device to enter the U.S. market without proper testing or approval. WRIGHT represented that the Wright Total Hip System design was substantially equivalent to other hip replacement products already on the market. *Id.* at ¶ 30.

- While representing to the FDA that it's [sic] Wright CONSERVE® System was "substantially equivalent" to other hip replacement products, WRIGHT omitted the Wright Total Hip System's critical distinguishing features. The Wright Total Hip System's femoral head has a circumference larger than industry standard. Also, the acetabular cup departs from industry standards in that it (1) is thinner; (2) has a smaller circumference; (3) is double-heat treated rather than single-heat treated; (4) has an exterior shell that lacks reliable bone ingrowth materials; (5) offers no obvious means of fixation other than the expectation that the patient's bone will grow into the porous exterior of the cup; and (6) has a low clearance which spreads the contact area out closer to the edge of the cup resulting in increased friction from the lack of lubrication

---

[2] Under Tennessee law, a plaintiff must prove "by clear and convincing evidence that the defendant 'acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly'" to be entitled to punitive damages. *Sanford v. Waugh & Co., Inc.*, 328 S.W.2d 836, 838 (Tenn. 2010).

entering the cup. *Id.* at ¶ 31.

- Defendant utilized misrepresentations that contradicted their own knowledge regarding activity levels and metal ions to drive sales of the CONSERVE® System. Despite knowing that increased activity would lead to increased wear, Defendant directed their marketing (via websites, journal ads, brochures, pamphlets, patient testimonials, endorsements, newspaper articles and other PR) aimed at surgeons and younger, more active consumers who wanted to return to the following strenuous physical activities, including but not limited to: surfing; yoga; skiing; martial arts, including competition levels; hockey; ice skating; motorcycling; horseback rides; tennis; golf; soccer; football; mountain climbing; running, including marathons and triathlons; hiking; biking, including trail riding; swimming; racquetball; active military duty; competitive wrestling; and kayaking. *Id.* at ¶ 54.

- Representative of these ads include:



*Id.* at ¶ 55.

- No later than 2003, WRIGHT recognized that, "metallic particulate debris is approximately an order of magnitude smaller than PE debris, thus even low rates of volumetric wear can lead to large numbers of particles." *Metal-Metal: Metal Ions – A Cause for Concern in Metal Bearings!*, presentation by John J. Jacobs, M.D. *Id.* at ¶ 56.

- Before, during and since WRIGHT designed developed, manufactured,

- marketed, and sold its CONSERVE® Systems, WRIGHT knew patients with CONSERVE® metal on metal hip implants exhibited 10 times higher concentrations of metal ions compared to patients with metal on poly hip implants. *Id.* at ¶ 57.

- When marketing the CONSERVE® Systems, WRIGHT worked to overcome a critical concern for metal-on-metal hip devices, i.e., metal ion release. Thus, as part of its marketing strategy to "de-criminalize metal ions" and drive sales, WRIGHT instructed its sales personnel, contrary to its knowledge, that the effects of metal ion release are known and have been demonstrated to be safe and had surgeon consultants promote that it's A-Class metal reduced wear and generated fewer metal ions. *Id.* at ¶ 58.

- WRIGHT promoted the decriminalization of metal ions through consulting surgeon Key Opinion Leaders' ("KOL") presentations to orthopedic groups, paid-for scientific data publications, celebrity endorsements, and sales representative training, among other avenues. *Id.* at ¶ 59.

- Defendant utilized taglines such as "Reduced Wear, Increased Longevity," "A-Class Never Compromise," and "A Hip for Life" in marketing it's a-Class BFH technology with the Conserve Total Hip Device. *Id.* at ¶ 60.

- Defendant have [sic] never reported the CONSERVE® System's high failure rates to surgeons, to patients with implanted CONSERVE® Systems, or to the public. *Id.* at ¶ 61.

- In particular, Defendant's advertisements and representations included this statement:

  > Despite improvements in the manufacturing, processing, and sterilization of polyethylene, wear related problems still exist in modem total hip arthroplasty. To address this problem, the CONSERVE® Total Hip System has eliminated polyethylene from the design altogether. The result is a one-piece, highly super finished metal-on-metal design, which provides significantly less wear particles than the conventional total hip replacement.

*Id.* at ¶ 66.

While WMT relies on *Dumler*, that case involved a much different set of punitive damages allegations. There, the plaintiffs relied on the same allegations set forth in their

13

fraudulent misrepresentation claim. *See Dumler*, 2018 WL 576848, at *15. I found that the fraud claim fell short of Rule 9(b)'s requirements and failed to state a claim under Rule 12(b)(6) based, in part, on plaintiffs' failure to allege facts that defendants knew the statements they were making about the safety of the Profemur CoCr neck and titanium stem were false at the time they were made. *Id.* I concluded plaintiffs' claim for punitive damages also failed as plaintiffs had not alleged sufficient facts of willful and wanton conduct and malice under Iowa law or facts demonstrating that defendants acted intentionally, fraudulently, maliciously or recklessly under Tennessee law. *Id. See also Jarrett v. Wright Med. Tech., Inc.*, No. 112CV00064SEBDML, 2019 WL 2567708, at *6 (S.D. Ind. June 21, 2019) (concluding that under Indiana law, punitive damages may be recovered on grounds other than fraud, but that if a plaintiff's claim for punitive damages is based on fraud, such allegations must be pled with particularity); *Hayes v. Wright Med. Tech., Inc.*, Case. No.: 16-CV-1072-CAB-(WVC), 2016 WL 11622065, at *4 n.3 (S.D. Cal. Oct. 7, 2016) (because plaintiff's request for punitive damages claim was premised on his fraud-based claims, which were dismissed, defendant's motion to strike or dismiss the punitive damages claim was rendered moot).

  Here, Evans does not assert a fraud claim and his punitive damages claim is not based on fraud. Because fraud is not a requirement of a punitive damages claim, the fact he did not plead the "who, what, when, where, why and how" of his punitive damages claim is not detrimental to his claim, as WMT argues. Evans alleges that WMT knew as early as 2003 that metal ion release was a problem with metal-on-metal hip implants and that before, during and since it designed, developed, manufactured, marketed and sold its metal-on-metal CONSERVE® system, patients exhibited 10 times higher concentrations of metal ions compared to patients with metal-on-poly hip implants. *See* Doc. No. 13 at ¶¶ 45, 56, 57. He alleges that despite knowing the dangerous effects of metal ion release (particularly with increased activity), WMT directed its marketing towards consumers seeking active lifestyles. *Id.* at ¶¶ 54, 55. It also instructed sales personnel to represent that the effects of metal ion release are known and have been

demonstrated to be safe and had surgeon consultants promote that the CONSERVE® system's "A-Class metal" reduced wear and generated fewer metal ions. *Id.* at ¶ 58.

Evans further alleges that WMT paid for marketing to "decriminalize" metal ion release. *Id.* at ¶ 59. Finally, he alleges that WMT failed to disclose the CONSERVE® system's high failure rates to surgeons, patients with implanted CONSERVE® systems or the public. *Id.* at ¶ 61. These allegations, if true, could constitute willful and wanton disregard for the rights or safety of another under Iowa law, or intentional, fraudulent, malicious or reckless conduct under Tennessee law. As such, WMT's motion to dismiss Evans' punitive damages claim will be denied.

## V. CONCLUSION

For the reasons stated herein, defendant WMT's partial motion (Doc. No. 21) to dismiss is **granted in part and denied in part**. It is **granted** as to Counts 4 and 5 of the first amended complaint and those claims are hereby **dismissed**. The motion is **denied** as to plaintiff's claim for punitive damages.

**IT IS SO ORDERED.**

**DATED** this 31st day of January, 2020.

_____
Leonard T. Strand, Chief Judge